36188.   RAY M. LEE CO. *v.* SATCHER CO., INC.

DECIDED JULY 5, 1956.

*Hull, Willingham, Towill & Norman,* for plaintiff in error.

*J. Walker Harper, Fulcher, Fulcher & Hagler,* contra.

FELTON, C. J. ■ The court did not err in overruling the objection to the amendment of paragraph 4. Paragraph 4 of the original petition merely alleged that the defendants were indebted to the plaintiff in a certain amount because the plaintiff "furnished" the defendant certain materials. The amendment was merely an elaboration and amplification of the original allegation and was in response to a special demurrer to that paragraph, the demurrer being, "Defendant demurs specially to the 4th paragraph of said petition as being vague, indefinite and uncertain because it is not alleged in said paragraph, or elsewhere in said petition, to whom plaintiff 'furnished' the 8040 sq. feet of roof decking insulation referred to in said paragraph." The amendment did not set out a new and different cause of action from that originally alleged.

■ The plaintiff contends that the defendant is liable for the material purchased because: "The defendant, R. H. White Company, Inc., ordered the materials herein described for its own use as subcontractor of Ray M. Lee Company, but prior to the completion of the services agreed to be performed under said subcontract, Ray M. Lee Company took possession of the materials which had been delivered to the job site by this plaintiff, together with materials which had been delivered by others, and physically took over the subcontract and ousted R. H. White Company, Inc., from the job and completed said subcontract itself and in so doing, it adopted the subcontract as its own, it received the benefits

of said contract and it is liable for all of the obligations of R. H. White Company, arising under said subcontract." The pertinent evidence is as follows: C. H. Stinson, an employee of the defendant, Ray M. Lee Company, was called for the purpose of cross-examination as an agent of the opposing party, and after being sworn, testified that he was secretary and treasurer of Ray M. Lee Company. Ray M. Lee Company was the general contractor that built the hospital commonly known as "St. Joseph." In the construction of the hospital, the Lee Company subcontracted a good part of its work, and there were working on the job approximately twenty-six or twenty-eight subcontractors from time to time. The subcontract with R. H. White Company was to install insulation around the heating and cooling ducts which were being installed by Modern Roofing & Metal Works, which had a subcontract for that duct work. The subcontract with the White Company provided that the cost of the work would be $26,505.00. The subcontract was not introduced in evidence, but was available for inspection at the trial. Work was begun under the subcontract in August, 1951. During the month of October, 1951, Lee Company paid to White Company $2,000.00 on account of the subcontract. On or about October 29, 1951, after White had begun work, one of the materialmen to White Company, Noland Company, notified Ray M. Lee Company that White Company was past due in the amount of $4,691.00, its account with them for the hospital job. R. H. White Company was working on two or three other jobs at the same time. On October 31, 1951, laborers working for White Company did not receive their week's wages because the checks given them by White Company did not clear the bank on account of insufficient funds. At this time R. H. White, as the General Manager of R. H. White Company, came to Atlanta, Georgia, to discuss his financial difficulties with this witness. It was estimated at this conference that the subcontract would cover the cost, and White would make several thousand dollars. Lee Company gave the checks to the employees of White Company to cover the payroll, and Lee Company paid off the Noland account, charging these advances against White on the subcontract. From November, 1951, until the completion of the insulation work on January 18, 1953, Lee Company paid with its own checks all wages of men employed by White on

St. Joseph's Hospital, and charged the advances to the White subcontract. A total of about $14,723 was paid in this manner for labor. It did not take many men to work on this insulating; many times there were only two on the weekly payroll. If Lee Company had not paid for a great deal of the materials and for the labor to complete the insulation of the ducts, it would never have been completed by White Company.

Mr. Stinson further testified on cross-examination that V. C. Hughes was the general superintendent of this job; that Hughes, as a general superintendent, had the duty to check all materials and merchandise delivered on the site, and to see that no materials were taken off the job site; he made regular reports on progress of the work. Mr. Hughes was instructed to watch R. H. White Company closely after Lee discovered that White was in financial difficulties. The following communication was identified by the witness and introduced in evidence by the plaintiff, without objection: "11/10/51. Mr. Hughes: Please keep a close check so that we can charge telegrams or telephone charges to R. H. White acct. (Signed) Stinson." Mr. Stinson explained that this message was to prevent White or his employees from making calls or sending telegrams that were not charged to the White subcontract.

Mr. Stinson further testified on cross-examination that White Company could not get delivery of a great deal of the materials to complete the work of White Company unless Lee Company guaranteed payment to the materialmen, and this Lee Company did in an effort to get the White Company work done. From the beginning of November, 1951, until April 7, 1953, Ray M. Lee Company paid for all materials which they guaranteed, and which was all that they knew about, for White Company which were used by White Company on the job, and this totaled $10,417.00; that toward the end of the job it became apparent that the work which was being done by White Company under his subcontract was going to cost White Company more than the subcontract price; the witness identified the following communication, which was written at that time, and it was introduced in evidence by the plaintiff without objection: "Inter-office correspondence, 8/16/52. To: V. C. Hughes, From: C. H. Stinson, Subj: R. H. White—Men & material. Confirming Mr. Lee's instructions re-

garding R. H. White men and material, this is to advise you to continue to keep a close check, and not to let any material be moved from the job. Concerning the men, White has to trim down to Mauldin and one man. The excess material on the job belongs to Ray M. Lee Company, and we are going to return it for credit in our name. Hold tight! Very truly yours, Ray M. Lee Company, Inc. By: C. H. Stinson."

The witness further testified that from time to time some of the laborers that worked for Lee Company may also have worked for White Company and other subcontractors. It was common practice for laborers to shift from one employer who no longer needed them to another who did. Mr. Hughes, of Ray M. Lee Company, did check on the insulation work from time to time because he had to check on all the work. Advice and instructions were given White Company about this job, but this is not unusual in the construction business. When the duct work insulation job had been completed, there was material left over. This material consisted of 3205.5 square feet of Celotex which had been purchased from the plaintiff. Lee Company took this material and sold it to Modern Roofing & Metal Works, Inc., and received a credit with that company of $280.64, which was adjusted later at the time its payments were made by Lee Company under its subcontract. This amount was credited on the debt which White owed Lee by virtue of Lee's overpayment on the subcontract.

The witness further testified that it kept close account of all its payments on the job, including the $2,000 first paid to White Company, and the proceeds from the sale of the Celotex; the insulating of the duct work cost more than the original subcontract with White Company. All payments except the first $2,000 went to pay labor and materials. The $2,000 was paid directly to White Company.

Mr. Stinson further testified on cross-examination that subsequently to October 10, 1952, Lee Company did pay for material delivered for the White Company job, and did pay laborers in order to keep the job going.

Fletcher Dudley, a witness for the plaintiff, after being sworn, testified that in December, 1952, he was employed by Satcher Company, Inc., which was at the time of the transaction out of which this suit was brought. He identified a purchase order from

R. H. White Company, Inc., dated December 11, 1951, and a copy of an invoice dated December 21, 1951, as the records of the business relating to this transaction. This purchase order and invoice were introduced in evidence by the plaintiff without objection. He did not know the White Company was in financial trouble when this material was delivered to the job.

C. H. Stinson, a witness for the defendant, after being duly sworn, testified that all advances made to materialmen and to workers of White by Ray M. Lee Company were charged to the amount owed White by Ray M. Lee Company on the subcontract. After all the advances had been made, Ray M. Lee Company did not owe White any money; and, in fact, advanced more money than the subcontract called for, so that White owed the corporation money at the conclusion of the construction. Ray M. Lee Company had no notice of the Satcher claim until October 10, 1952. Subsequent to that date the company did pay for other material delivered to White, because the material would not be delivered unless they guaranteed payment. Also, subsequent to the date of notification of the Satcher claim, they paid some laborers of White in order to have the job completed.

The evidence does not show that the defendant ousted White Company or directed the time, manner and method of White Company's operation. The defendant did advance the payroll and certain moneys to White Company but charged it against their account. The defendant guaranteed payment and paid for certain materials which were used by White Company and purchased from materialmen other than the plaintiff but it was because those materialmen would not sell to White Company without such guarantee. Here, too, such moneys were charged against White Company's account. As to taking over the execution of the subcontract, the evidence shows nothing more than the defendant's keeping a close watch over the work being done. This it had a right to do to see that the contract was being complied with and that unauthorized telephone calls, etc., were not being charged to the defendant. The plaintiff's own evidence showed that it did not know that White Company was in financial difficulty and that it sold material to White Company. The only reasonable conclusion that can be drawn from this evidence is that the plaintiff sold the materials on the strength of White

Company's credit and was not looking to the defendant for payment. Some of the material sold by the plaintiff to White Company was left over and the defendant took charge of it. The plaintiff contends that this is further proof that the defendant took over the execution of the subcontract. We think not. The defendant had advanced to White Company more money than the contract price and then took charge of such material to recoup part of the overpayment. Of this the plaintiff cannot complain. In the absence of an agreement otherwise, it will be presumed that the title to the material passed to White Company on delivery and thus title was in White Company when the defendant took the surplus material to apply against the overpayment to White Company.

The evidence did not authorize a judgment for the plaintiff. Therefore, the court erred in rendering such judgment and in denying the defendant's motion for new trial.

The court did not err in allowing the amendment over objection.

*Judgments affirmed in part and reversed in part. Quillian and Nichols, JJ., concur.*